# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALFREDO GALLARDO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15 cv 7458 |
| v. ) | |
| ) | Judge Sharon Johnson Coleman |
| CHICAGO TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Alfredo Gallardo, filed a two-count Second Amended Complaint, alleging discrimination based on race, ancestry, and disability. The defendant, Chicago Transit Authority ("CTA"), moves for summary judgment in their favor [79]. For the reasons stated herein, this Court grants the motion.

**Background**

The following facts are undisputed. Plaintiff, Alfredo Gallardo, has worked intermittently at CTA since 1991. After being laid-off in February 2010 from his position as a Bus Maintenance Manager I, Gallardo returned to CTA in May 2013 when he was hired as a full-time Rail Maintenance Manger I. The position of Rail Maintenance Manager I is an exempt, non-union position. Gallardo's future manager, Jeffrey Bell, interviewed him for the position with two other managers. Rail Maintenance Manager Is are responsible for meeting with the prior shift's manager, reviewing materials, listing defects, assigning night shift work through the maintenance management system ("MMIS"), monitoring workers, and communicating with the rail controller.

CTA provided Gallardo with a document entitled "Probationary Status for All New Employees," which explains the conditions and parameters of the probationary period for new hires.

According to the document, exempt employees are on "probationary status" for the first six months of employment. Gallardo's new position was "exempt." This document enumerates five circumstances in which CTA will terminate employment. Gallardo received a "New Hire Checklist" from CTA. Gallardo signed the checklist and initialed after checking the box, "Probationary Status." Gallardo testified that he was not advised that he was subject to the probationary period and claims he was not an at-will employee.

SCADA is an electronic online database that CTA uses to draft incident reports. The CTA control center drafts the SCADA reports and sends them to work locations. CTA has used a system called MMIS for work orders that employees can use to document "job on and job off work tasks" since 2004. Gallardo had used the MMIS system during his prior employment at CTA from September 2009 to February 2010.

As a Maintenance Manager I, Gallardo reported to Maintenance Manager II, Jeffrey Bell. Newly-hired Rail Maintenance Manager Is are given on-the-job training at an assigned CTA shop. The training consists of shadowing another Rail Maintenance Manager I to learn how to perform the functions of the job. When CTA hired Gallardo in 2013, his manager Bell told Gallardo that he would be learning how to do his job on a "sink or swim basis." Rail Maintenance Managers I do not receive formal classroom training relative to the writing of reports and other related documents like action plans. Instead, they are provided with sample documents and can pose questions to their managers. Gallardo initially was not on the electronic distribution list to receive sample documents. Bell testified that he added Gallardo to the list after learning of the omission. Bell told Gallardo that he could reach out to Joanne Petty, a rail maintenance manager with 15 years of experience, and Jan Padowski, who had over 25 years of rail maintenance management experience. Both Petty and Padowski worked a similar shift to Gallardo.

The Rail Maintenance Manager I position is "on call 24-hours a day, 7-days a week for emergencies and to supplement normal maintenance effort when required by weather or another emergency condition. In addition to performing the duties specifically listed in the Rail Maintenance Manager I job description, managers would also be required to perform various duties as assigned. Manager level employees were occasionally required to pick up or drop off other CTA employees at the airport. Sometimes managers would stay on their shifts longer than scheduled.

Gallardo asked to start at the Des Plaines shop because it was less busy than the Rosemont shop. His request was denied. Approximately two weeks after beginning work, Gallardo told Bell that he did not have keys to the Des Plaines shop. Bell asked him to take a truck from the Rosemont shop to the Des Plaines shop to ensure that the Des Plaines shop had keys. The lack of keys initially caused Gallardo to be locked out of the office on a few occasions.

At around 3:26 p.m. on August 10, 2013, a rail vehicle struck the platform on the south side of the Austin Blue Line station. CTA rules direct that the manager closest to an incident and in the direction the train is travelling is responsible for addressing the incident. Because the Des Plaines shop was closer to the Austin station in the direction of travel, Padowski as manager at the Des Plaines show should have addressed the incident.

When Gallardo was notified of the incident his shift had ended but he was still at work. Gallardo testified that he called Padowski to confirm that Padowski would address the Austin collision. According to Gallardo, Padowski told him to go home as Padowski had already done and let the On-Call Manager handle it. At 3:40 p.m. Bell contacted Gallardo to inquire about the incident and learned that Gallardo had left the shop for the day. Bell instructed Gallardo to return to work and address the incident by taking the rail cars that hit the platform out of service and drafting an Unusual Occurrence Report. Gallardo returned to the Rosemont shop around 5:00 p.m. and

3

prepared a preliminary Unusual Occurrence Report relative to the incident. An Unusual Occurrence Report reiterates what is in the SCADA Report and describes the action taken to address the issues. CTA admits that Bell erroneously accused Gallardo of abandoning his shift. Bell conceded in his testimony that Padowski should have been the one to respond to the incident.

In his Unusual Occurrence Report, Gallardo did not identify that there were black marks on the side of the rail cars which were caused when those cars struck the Austin platform. His report states that he observed no collision or impact damage to the rail vehicles. Gallardo testified that he did not include the black marks in his report because all the rail cars in the shop had black marks, even ones that were not involved in the incident. At least forty rail vehicles were found to have the same black scuff marks after Bell checked on them in the Rosemont Yard. Bell redrafted Gallardo's report to include the damage and to notify other departments of the problem and set up slow zones. Bell considered Gallardo's report to be poor work performance.

After the Austin incident on August 10, 2013, Gallardo requested four hours "comp time," to reflect the additional hours he had worked that evening. CTA has a discretionary, rather than formal "comp time" policy. Gallardo's request for comp time would have to be approved by General Manager of Rail Maintenance Larry O'Connell. Bell informed Gallardo that managers typically must work additional hours to complete their assignments and that Gallardo would not be compensated for everything he did. O'Connell denied Gallardo's request. After learning that O'Connell denied his request, Gallardo sent him an email stating: "Mr. O'Connell, be advised that I am fully prepared to seek a fair and just resolution to this matter via the Employment Relations Department, in the event a satisfactory outcome cannot be achieved through this means." Bell found this email threatening.

On August 15, 2013, Bell sent an email to all Blue Line Managers and Coordinators, including Gallardo, outlining new procedures for handling defective railcars. Gallardo responded to

4

Bell: "Jeff, I am going to save you the embarrassment of replying to all and will simply direct this email solely to you." Bell considered this email to be disrespectful and belittling based on the tone and content.

On August 21, 2013, Bell learned about eighteen bad orders, which are reports of defective rail cars, on the CTA's Blue Line. Bell asked Gallardo about the status of the bad orders and for an action plan to resolve them. Bell also asked Petty to produce an action plan. Bell provided Gallardo with information about what to include in the action plan, including a list of bad order, hold cars, and shop actions to be completed by 22:00 hours on August 21, 2013. In his action plan, Gallardo listed the trains that needed repairs and assigned some of the repairs to the night shift, but it was not a proper action plan according to Bell. Gallardo's failure to properly draft and implement an action plan did not appear to Bell to be a training issue, but rather an example of poor work performance. CTA admits that Petty was not formally disciplined for deficiencies in her action plan.

On August 22, 2013, three months after he was hired as a Rail Maintenance Manager I, Gallardo emailed Bell, stating that he was overwhelmed and that he lacked job-related knowledge and experience. Bell responded by email, informing Gallardo that the CTA had high expectations and demands. He also reiterated that most of Gallardo's learning would be on the job. Bell told Gallardo, "if there is an issue, contact me and we will work through it." Gallardo testified that he requested additional training and was denied.

On August 26, 2013, Gallardo took a leave of absence from work pursuant to CTA's sick time policy. He alleges that his anxiety and depression caused him to have trouble sleeping, concentrating, breathing, thinking, eating, marital relations, and feelings of hopelessness. Gallardo admitted that none of the symptoms of depression or anxiety impacted his ability to perform his job duties while he was a Rail Maintenance Manager I. Bell testified that he did not know why Gallardo

took disability leave. Gallardo testified that he told both Bell and O'Connell about his medical conditions.

Sedgwick is CTA's third-party administrator who approves disability leave requests. Gallardo sent all medical records to Sedgwick while he was out on leave according to CTA's policy. Gallardo was diagnosed with major depression and anxiety disorder during his medical leave. He contends that this diagnosis is indicated in his medical records. Seth Wilson, then Director of Human Resources, testified that he did not have any recollection of Gallardo being on an approved short-term disability leave or speaking to Gallardo during his leave. Bell communicated with Gallardo during his medical leave to check on his return to work date as required under Administrative Procedure #1009. Bell testified that he never knew that Gallardo was off work for anxiety and depression and that Gallardo never informed him of any illnesses. Gallardo testified that he did tell Bell about his medical conditions, hospitalization, and medication.

On August 23, 2013, before Gallardo went on medical leave, Bell drafted a recommendation for Gallardo's discharge. That same day, O'Connell wrote a memo to Seth Wilson recommending that Gallardo be administratively separated from CTA due to "his inability to perform his duties and his misrepresentation of his abilities on his resume." Bell signed the final copy of his recommendation for discharge addressed to O'Connell on August 27, 2013. The reasons for discharge set forth in the recommendation were Gallardo's admitted lack of knowledge, overall poor performance, disrespect towards his supervisors, and failure to comply with the CTA's rules, regulations, policies and procedures. It referenced specific examples of when Gallardo engaged in poor work performance and disrespected supervisory personnel, including the August 10 and 21 incidents and the emails sent to O'Connell and Bell. Once a recommendation for discharge is written, it is sent to "upper management" for review and approval.

Wilson mailed Gallardo a Notice of Termination by certified mail on October 25, 2013. The Notice of Termination was signed by Wilson and O'Connell. Gallardo received the Notice on October 29, 2013. The Notice detailed the grounds for Gallardo's termination, including his unprofessional behavior, disrespect for management, violation of CTA's rules, policies, procedures, and overall poor performance during the probationary period. Bell testified that progressive discipline does not apply to probationary employees. The Rail Maintenance Manager progressive discipline policy contained in the record does not state whether it applies to probationary employees. Gallardo asserts that the progressive discipline policy applied to him and was not followed.

When Bell and Gallardo met about the Performance Feedback Form that Gallardo completed, Bell did not tell him that he disagreed with Gallardo's positive assessment of his own performance. Wilson testified that he had no recollection of contacting Gallardo while he was finalizing the Notice of Termination. Wilson admitted that it would have been helpful to have known that Gallardo repeatedly asked for help and training from management.

Gallardo filed a complaint with the Board of Review under Section 28 of the MTAA. On December 3, and 15, 2014, a three-member committee from the Board of Review held a hearing on the complaint. Gallardo was represented by counsel at the hearing and had an opportunity to present evidence and cross-examine witnesses. The Committee sustained Gallardo's discharge, finding that his unprofessional behavior and poor work performance were detrimental to the CTA. Gallardo sought review of the decision in the Circuit Court of Cook County, which upheld the Board of Review's decision. The Illinois Appellate Court affirmed the Board of Review's decision.[1]

---

[1] CTA moved for leave to file supplemental authority [102], namely the Illinois Appellate Court's Illinois Supreme Court Rule 23 Order upholding the Board of Review's decision sustaining Gallardo's discharge. The motion is granted over Gallardo's objection. CTA requested this Court give preclusive effect to the Illinois Appellate Court's finding that Gallardo's poor performance and unprofessional conduct were sufficient to discharge him. This Court declines to give preclusive effect to that decision because administrative proceedings operate under different standards of proof and plaintiff did not have the benefit of discovery that he has here. However, this Court will take judicial notice that this matter proceeded through the administrative review process and the Illinois Appellate Court so held.

Gallardo is Hispanic. Gallardo testified that he told Bell that he was Hispanic and of Cuban ancestry. Bell denied that he knew Gallardo's race or ancestry. He admitted that Bell never used any racial slurs with him. Gallardo testified that Bell treated him differently based on his race through his tone of voice and use of profanity. Gallardo did not file any contemporaneous complaint against Bell. Although Gallardo testified that he kept a notepad documenting his alleged mistreatment, he no longer has it. Gallardo testified that he concluded that Bell did not like his action plan from the August 21, 2013, incident was because he is Hispanic. Bell and O'Connell are both white. Wilson is black.

Gallardo identifies Joanne Petty and Jan Padowski as non-Hispanic, non-Cuban, non-disabled, CTA employees who were treated more favorably.[2] Petty had over 15 years of continuous employment with the CTA. Padowski had been a CTA employee continuously for 25 years. At the time of Gallardo's discharge, both Petty and Padowski had the same title, responsibilities, shift, and manager as Gallardo. Petty is black and Padowski is white.

Gallardo subsequently filed the instant lawsuit alleging race and ancestry discrimination under Title VII and disability discrimination under the ADA. CTA moves for summary judgment on both Counts.

**Legal Standard**

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as

---

[2] Gallardo also suggested that Carmella Brown is a valid comparator, but there is insufficient evidence in the record regarding her role and responsibilities at CTA for this Court to find her similarly situated.

8

true and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

**Discussion**

*1. Title VII: Race and Ancestry Discrimination*

CTA moves for summary judgment on Gallardo's claims that his discharge from employment was the result of discrimination based on his Hispanic race and Cuban ancestry, arguing that the Gallardo cannot show that he was meeting CTA's legitimate employment expectations and failed to identify similarly situated individuals who were treated more favorably. To establish employment discrimination under Title VII, courts in this Circuit ask:

> [W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …. Relevant evidence must be considered and irrelevant evidence disregarded.

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)(internal quotation marks omitted)(quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Courts continue to use the familiar *McDonnell-Douglas* burden-shifting framework to evaluate the evidence in the record. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (noting that "*Ortiz*, however, did not alter [t]he burden-shifting framework created by *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)"). To establish *prima facie* discrimination, Gallardo has the initial burden to show that (1) he is a member of a protected class; (2) performed reasonably on the job in accord with CTA's legitimate expectations; (3) was subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *Johnson*, 892 F.3d at 895. "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action,

9

at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 225 (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765).

Although Gallardo is unquestionably a member of a protected class and suffered an adverse employment action by the termination of his employment, he cannot show that he was meeting CTA's legitimate employment expectations and fails to demonstrate that Petty and Padowski are similarly situated. Gallardo argues that the job performance issues in his Notice of Termination were the result of a lack of training rather than poor performance. Yet, the undisputed record testimony shows that employees in the Rail Maintenance Manager I position receive on-the-job training. Further, they are provided with samples of the reports they are expected to use. While Gallardo was initially deprived of those samples, he was added to the email distribution list when his supervisor, Bell discovered the omission. Gallardo also asserts, with respect to the incident on August 10, 2013, that Padowski should have been the one to respond. Even if true, that does not alter the fact that Bell instructed Gallardo to respond to the incident at the Austin station when he was unable to reach Padowski and Bell found deficient the resulting Unusual Occurrence Report that Gallardo submitted. Similarly, Gallardo asserts that both he and Petty were told to complete action plans for the bad orders on the Blue Line on August 21, 2013. Even if Petty's action plan was also insufficient that does not mean that Gallardo was meeting job expectations. The Court looks at Gallardo's job performance "through the eyes of [his] supervisors at the time of [his] suspension and termination." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). This Court therefore finds that Gallardo has not shown that he was meeting CTA's job expectations.

Gallardo also fails to identify similarly situated employees that were treated more favorably. To establish this element, Gallardo "need not show that other employees are explicitly *identical* to [himself]—indeed, that would be a nearly insurmountable burden and this Court repeatedly has

cautioned against a hyper-technical approach to this prong. *E.g., Gates*, 513 F.3d at 690; *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404–05 (7th Cir. 2007); *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 831 (7th Cir. 2007). Gallardo identifies both Petty and Padowski as comparators, arguing that each held the same job title, responsibilities, and supervisor. There is a very significant difference between Gallardo and his comparators. Neither Petty nor Padowski were probationary employees in the first six months of their employment. *See Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 626 (7th Cir. 2006) (tenured university professors were not similarly situated to untenured plaintiff professor who was not reappointed after "widespread complaints from both students and supervisors"). Gallardo attempts to refute his status as probationary by pointing to his prior employment with CTA. This Court is unpersuaded.

Gallardo admits he received and signed the New Hire Checklist, checked the box titled "probationary status," and received the document entitled "Probationary Status for All New Employees," explaining the conditions and parameters of the probationary period for new hires. It would be patently unreasonable for Gallardo to believe that he was not subject to the probationary status of a new employee when he was provided with the documents after not being employed at CTA for a period of three years. "A proposed comparator's position or rank may be important, but only '*provided that the employer took these factors into account* when making the personnel decision in question.'" *Coleman v. Donahoe*, 667 F.3d 835, 849–50 (7th Cir. 2012) (quoting *Eaton v. Indiana Dep't of Corrections,* 657 F.3d 551, 559 (7th Cir. 2011) (emphasis in original)). The Notice of Termination that Gallardo received expressly noted his probationary status.

Moreover, Gallardo has not produced any evidence that either Petty or Padowski engaged in the disrespectful conduct recited in Gallardo's termination letter. *Cf. Coleman*, 667 F.3d at 851 (explaining whether proposed comparators engaged in conduct of comparable seriousness). The question of whether a comparator is similarly situated is typically a question of fact for trial, "unless,

11

of course, the plaintiff has no evidence from which a reasonable fact-finder could conclude that the plaintiff met his burden on this issue." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549 (7th Cir. 2017). This Court finds that Gallardo fails to meet his burden on this element.

Because Gallardo fails to meet his burden to establish *prima facie* discrimination, this Court could end its inquiry here. *Gates*, 513 F.3d at 691 (citing *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1011 (7th Cir. 2000)). In the interest of completeness, this Court will consider whether there is sufficient evidence in the record to show a genuine issue of material fact on CTA's proffered nondiscriminatory reason for discharging Gallardo from his position. CTA presents the Notice of Termination and the inappropriate behavior articulated therein and Gallardo's probationary, at-will employment status as nondiscriminatory reasons for terminating Gallardo. Indeed, the record supports finding that CTA has met its burden. Gallardo does not dispute that any of the alleged conduct occurred, but makes excuses or attempts to explain the conduct as not sufficiently severe to warrant termination. Even if the Court considered Wilson and Bell's testimony in hindsight that maybe Gallardo needed more training and maybe his emails were not as severe as they seemed at the time, that does not alter the fact that CTA has proffered nondiscriminatory reasons for terminating Gallardo's employment. "Pretext" in this context means a phony excuse and not merely a mistake. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Once CTA has proffered its legitimate and nondiscriminatory reason for firing Gallardo, the burden shifts back to Gallardo to submit evidence that CTA's explanation is pretextual. *David*, 846 F.3d at 225 (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765). The record is devoid of such evidence. Gallardo asserts that Bell knew he was Hispanic and Cuban. Bell averred that he was not aware of that until Gallardo complained of discrimination. Gallardo admitted that Bell never used any racial epithets or slurs. He claimed to have kept a journal documenting Bell's mistreatment of him, but he no longer has it.

12

Gallardo's uncorroborated subjective testimony that Bell mistreated him based on racial or ancestral animus is insufficient to create a genuine issue of material fact. Thus, there is nothing in the record to support that Bell's recommendation to terminate Gallardo was motivated by racial or ancestral animus.

Even under the "cat's paw" theory, Gallardo cannot meet his burden. In discrimination cases, the "cat's paw" is "the unwitting manager or supervisor who is persuaded to act based on another's illegal bias." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). With sufficient evidence, a jury may draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision. *Id.* There is no such evidence here. It is undisputed that O'Connell was the decision-maker, not Bell. *See Metzger v. Illinois State Police,* 519 F.3d 677, 682 (7th Cir. 2008) (employee's retaliation claim could not survive summary judgment where employee did not come forth with evidence that biased non-decisionmaker's comments actually influenced decisionmaker, much less were the "singular influence" that cat's paw theory requires). Moreover, even if Bell were biased against Gallardo, nothing in the record suggests that O'Connell was persuaded to act based on Bell's bias and not on the conduct by a probationary at-will employee that was articulated in the recommendation for discharge. Gallardo's evidence amounts to nothing more than speculation. *Houlihan v. City of Chicago*, 871 F.3d 540, 554 (7th Cir. 2017). Accordingly, this Court finds that no genuine issue of material fact exists on Gallardo's Title VII claim for race and ancestry discrimination.

*2. ADA: Disability Discrimination*

The ADA prohibits employers from discriminating against qualified individuals due to a disability. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018). To defeat summary judgment on his disability discrimination claim, Gallardo must point to evidence capable of

13

establishing that (1) he is a person with a disability within the meaning of the ADA; (2) he is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) he suffered from an adverse employment decision as a result of her disability. *Guzman v. Brown Cty.*, 884 F.3d 633, 641 (7th Cir. 2018) (citing *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005)). The undisputed facts do not support a reasonable inference that Gallardo is disabled.

"Under the definition of 'disability' in 42 U.S.C. § 12102(2), a person has a disability if the person is actually disabled, has a record of such disability, or if the person is perceived as disabled." *Pellack v. Thorek Hosp. & Med. Ctr.*, 9 F. Supp. 2d 984, 989 (N.D. Ill. 1998). Gallardo claims he is disabled by anxiety and depression under any of the three definitions. This Court will address each argument.

An individual is "actually disabled" if he suffers from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Gallardo testified that his anxiety and depression cause him to have trouble with the following: sleeping, concentrating, breathing, thinking, eating, marital relations, and feelings of hopelessness. His testimony is unrebutted and the Court will take his testimony as true.

Gallardo also asserts that he has a record of disability. His medical records are not contained in the record before the Court on summary judgment. While there is no meaningful dispute that Gallardo was on medical leave and obtaining treatment for symptoms related to anxiety and depression, there is no evidence in the record to support this claim.

Gallardo also claims that CTA regarded him as disabled. A person is regarded as disabled by his employer if he "has been subjected to an action prohibited under this chapter because of actual

14

or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(1); *see also* 29 C.F.R. § 1630.2(l) (identifying termination as an action prohibited under the ADA); *Stragapede v. City of Evanston*, 69 F. Supp. 3d 856, 862 (N.D. Ill. 2014). There is no evidence in the record to indicate that CTA regarded Gallardo as disabled. The undisputed facts show that Gallardo was not diagnosed with anxiety and depression until he was on medical leave. There is thus no action that Gallardo can point to that demonstrates that CTA, through any of its employees, perceived Gallardo to be disabled and treated him as such.

Even if the Court accepts that Gallardo was actually disabled by his anxiety and depression, he testified that none of the symptoms impaired or impacted his ability to do his job. Moreover, a third-party, Sedgwick, handles CTA employees' request for medical and disability leave and, thus, the record does not show that Bell or O'Connell or Wilson would have had access to Gallardo's medical records. Although Gallardo testified that he told Bell of his medical condition, that is insufficient by itself to establish that Bell recommended Gallardo's termination based on his disability. This is particularly true where, as here, Gallardo admitted that Bell drafted the recommendation for termination prior to Gallardo's medical leave. The connection between CTA's discharge of Gallardo and his disability is further attenuated by Gallardo's admission that his symptoms did not impact his job performance and he was not diagnosed until he was on medical leave. Accordingly, the record lacks any evidence on which a trier-of-fact could reasonably find that CTA's decision to terminate Gallardo's employment was motivated in any way by an improper purpose.

**Conclusion**

Based on the foregoing discussion, this Court grants defendants' motion for summary judgment [79]. Civil case terminated.

IT IS SO ORDERED.

Date: September 29, 2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge